J-A01012-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| M.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| K.B. | |
| Appellant | No. 832 EDA 2015 |

Appeal from the Order Entered February 13, 2015
In the Court of Common Pleas of Chester County
Domestic Relations at No(s): No. 01295N2013 PACSES No. 090108307

BEFORE: LAZARUS, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED APRIL 08, 2016**

Appellant K.B. ("Father") appeals from the order entered by the trial court in this child support case. We vacate and remand for further proceedings.

The lower court aptly summarized the history of the case and its findings and conclusions as follows:

> This is an action by plaintiff [Appellee M.B., hereinafter "Mother"] to modify an existing support order entered on September 18, 2013 with an effective date of September 1, 2013. The original order covered two children, [Ma.B.] (d.o.b. 9-23-09) and [Ko.B.] (d.o.b. 12/31/04). Another child, [Kh.B] (d.o.b. 3/28/14), was conceived and born subsequent to the parties['] divorce. Plaintiff seeks to have [Kh.B.] added to the order as of April 16, 2014. A further issue is the earning capacity of each party.
>
> The parties have a 50-50 custody arrangement for [Ma.B.] and [Ko.B.]. While [Mother] has had primary custody of [Kh.B]l since birth, the parties agreed that she too would be included in the 50-50 custody arrangement effective March 15, 2015.

*Former Justice specially assigned to the Superior Court.

When the order of September 18, 2013[,] was entered, [Mother's] monthly net income was "determined" to be $1,500 and [Father's] $2,000. I[1] use the term "determined" loosely as neither party brought wage statements or tax returns to the conference to verify their incomes. They, not the court, "determined" what their incomes were. Now that the court has to "determine" earnings/earning capacity, it comes as no surprise that the parties disagree significantly as to what their earnings were or should be. The fact that both are self-employed in occupations where cash is a common method of payment complicates my analysis.

Testimony was taken on December 16, 2014[,] at which time I had the opportunity to observe the witnesses, judge their demeanor and assess their credibility. Each witness will be addressed separately.

I also have the benefit of the parties['] briefs.

<u>Mrs. [B.] [Mother]</u>

[Mother] worked in the day care in the day care industry where she earned approximately $30,000/year gross. Once her children were born she was able to bring them to work with her at no cost.

After the parties initially separated, she babysat out of her home for several children earning a comfortable sum. However, when she became pregnant with [Kh.B.] she had to cut back on the number of children she could supervise and, significantly, had to stop working for several months after [Kh.B.] was born. Obviously, this interruption caused a loss of clientele which is understandable. Further, the ability to supervise not only her own children, but other children was complicated by having to tend to an infant.

To the argument that she should attempt to return to a day care position, she responded that due to the ages of the children she

---

[1] All first-person references in the lower court's opinion are retained for ease of reading.

would have to pay for their care which would greatly reduce her income.

[Mother] suggests that her current situation of babysitting at home is the most sensible approach, a position I agree with FOR THE TIME BEING.

[Father] argues that [Mother's] admitted monthly expenses of approximately $2,130 supports the conclusion that she must be earning $25,000+/year babysitting. [Mother] countered that family was assisting her.

A further complication for [Mother's] business model is that state law regulates the number of children that can be babysat at any one time. I realized this may be one of those regulations honored more in the breach than by compliance. However, it is a limitation on her earnings/earning capacity.

[Mother's] 2013 tax return showed receipt of gross income of $18,128 from her babysitting business. I did not have the benefit of a 2014 return, but I imagine it would not be greater than her 2013 income given the birth of [Kh.B.] and the impact that had on [Mother's] ability to babysit other people's children.

Accordingly, for 2014, I determine[d] [Mother's] earning capacity to be $18,128. For 2015, I determine[d] her earning capacity to be $24,000, as I believed she will be able to rebuild her clientele to its former level.

### Mr. [B.] [Father]

[Father] is obviously very distressed by the dissolution of the marriage and asserts that it has impacted his ability to work. He also asserts that his business has suffered from the decision of former clients to take work he previously did for them "in house.'

*It has been my experience as a judge and practitioner that "competent tradesmen" are always in demand no matter what the state of the economy is. While certainly larger clients may cut back in tight economic times, there are always a myriad of smaller jobs available for one wanting to work. In happier times, [Father's] business did very well. I am certain it did so as he was motivated to perform for the benefit of his family. It is*

therefore not surprising that the downturn in his business coincides with the dissolution of his marriage.[2] Interestingly, as

[2] Exhibit D-3 shows the decline in earnings that, in my view, coincides with the dissolution of the family unit:  2010 - $585, 142.55; 2011 - $685,609.01; 2012 - $405,099.03; 2013 - $335, 411.91.

of the date of the hearing, [Father] did not have available for review his 2014 year to date profit and loss statement.  *In fact, he only submitted the 2013 tax return of his company after the hearing of December 16th was concluded[, pursuant to court order.]  I am considering the document as it's preparer testified at the hearing.*  Initially, I note that there is a positive $12,000 difference between Exhibit D-3 and the 2013 tax return "gross receipts" number.  Further, it is my understanding that Mr. Dominick, the CPA [and preparer of the return], was given the supporting data by [Father] and has just begun functioning as his accountant.[3]  Despite my concerns, I accept the 2013

[3] A new accountant lacks a sense of the business "long term" as he has nothing to compare the data given to him with the historical record of the business.  Accordingly, the numbers used for this return are viewed with some skepticism on my part.

business tax return as accurate.

[Father] operates his business from his home which affords him a tax benefit yet his [business] return shows a "rent" charge. He also purchased a new truck to replace one that was only 13 months old.  His stated reason for doing so is not credible.  I am hard pressed to accept "automobile and truck expenses" of $10,838 for a single vehicle and that it cost $16,374 to fuel.  I note that [Father] received a $26,093 "loan" from his company. There are significant legal fees ($6,015) and a "uniform" cost of $100/month.  While all these deductions pass the federal tax SMELL test, they are warning bells to me that someone is intentionally trying to drive down their "income."  I recognize that in "happier times" both parties are generally willing participants in this type [of] conduct as the savings drop to the

"joint" bottom line, i.e., real dollars available to spend. However, in times of conflict, this type of income adjusting quickly becomes unacceptable to one of the parties.

[Father] has an obligation to maximize his income for the benefit of his children even if doing so results in an indirect benefit to his former wife. The focus of all, court and parents, needs to be on the children, not indirect beneficiaries. When I add back "suspect deductions"[4] I find [Father's] 2013 income to be just over $100,000.00, a sum consistent with what a competent tradesman of his experience would earn. Accordingly, I find his earning capacity to be $104,000.00/year for 2013 and going forward.

---

[4] To me, a "suspect deduction" is one that while allowed for federal tax purposes permits a person to shift what would otherwise be taxable outlays or income to tax deductible ones or to have the use of funds (a loan) versus ownership of the funds (income).

---

### The Accountants

Ms. Evans testified for [Mother] and Mr. Dominick testified for [Father]. Neither contributed anything of significance to my analysis.

****

Lower Court Opinion, filed February 13, 2015, at 1-5.

The lower court entered an order directing child support payments consistent with its determination of the parties' respective earning capacities. Father filed this timely appeal, in which he raises the following issues for our review:

1. Whether the lower court abused its discretion when it ignored and misapplied law by placing the entire burden of supporting the children on Father, held Father to an artificially high

income, considered matters not of record and did not accurately calculate Mother's income available for support.

2. Whether the lower court abused its discretion by exercising judgment that is shown by the record to be manifestly unreasonable as well as the product of partiality, prejudice and bias toward Father and by making assumptions that were gender based.

3. Whether the lower court's decision must be reversed because there is insufficient evidence on the record to sustain the support order that holds Father to an artificially high and unsubstantiated $104,000.00 gross income per year and Mother to an unreasonably low $18,000.00 gross income per year where the record indicated that Mother's true income and her earning capacity were in excess of $30,000.00 gross per year.

Appellant's brief at 5.

Our standard of review over child support orders is:

When evaluating a support order, this Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. We will not interfere with the broad discretion afforded the trial court absent an abuse of the discretion or insufficient evidence to sustain the support order. An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused. In addition, we note that the duty to support one's child is absolute, and the purpose of child support is to promote the child's best interests.

*Kimock v. Jones*, 47 A.3d 850, 853-54 (Pa.Super. 2012).

Essentially, Father's issues coalesce to challenge the court's calculations of the parties' respective earning capacities. To the extent Father charges error in the calculation of Mother's earning capacity, our careful review leads us to disagree, as the court's determination in this

regard finds ample support in the record. In this respect, we adopt the attached lower court opinions and their expression of rationale as to Mother's earning capacity.

As for Father's earning capacity, however, we determine that the court erroneously based its calculations on important evidence not introduced into evidence. It is well-settled that a trial court may not consider evidence outside of the record in making its determination. **Ney v. Ney**, 917 A.2d 863, 866-67 (Pa.Super. 2007) (citing **Eck v. Eck**, 475 A.2d 825, 827 (Pa.Super. 1984)). "Nor may this court uphold a trial court's order on the basis of off-the-record facts." **Eck**, at 27 (citing **In re Frank**, 423 A.2d 1229 (Pa.Super. 1980)).

In **Ney**, this Court reversed a support order and remanded for a redetermination of the father's earning capacity where it was evident that the trial court had based its earning capacity calculations in large part on its own internet search of job opportunities in the father's field of work, even though such results were unsubstantiated by evidence of record:

> It is apparent that the trial court found that [the father] willfully failed to seek appropriate employment based upon its own internet job search. There is no other evidence of record that there were suitable positions available, and that [the father] failed to apply for these positions. Thus, we conclude that the trial court abused its discretion when it considered and relied on this evidence.
>
> On this basis, we reverse the Orders of the trial court, and remand for a determination of [the father's] earning capacity based only upon the evidence of record. In light of our holding, we need not address [the father's] remaining claim of error.

- 7 -

*Id.* at 868. ***Compare Commonwealth v. Bogosian***, 12 A.3d 448, 460-61 (Pa.Super. 2011) (distinguishing ***Ney*** where trial court, deprived of precise valuation records in father's control, nevertheless relied on evidence of record in applying unconventional method of calculating equitable distribution as equities in case required).

Upon our review of the record, we conclude that the lower court, notwithstanding its thoughtful, perceptive, and concerted efforts to promote the equities of the case, improperly considered evidence outside of the record in determining Father's earning capacity. Pivotal to the lower court's calculation was its consideration of the 2013 federal tax return of Father's business, which the court ordered Father to supply only after the hearing's conclusion. Indeed, the court indicated the business return was necessary to a meaningful analysis of Father's earning capacity:

> **THE COURT:** Well, to get a real fix on everything here, I need [Father's] 2013 business tax return. So by next Monday, counsel, I want you to provide me with a copy of that 2013 business return and provide the other side with it. Just for information purposes, I will look at it myself, because while there are plenty of things that get deducted, they don't necessarily get deducted for support purposes, and we will have an opinion for you promptly thereafter. Have a nice day.

N.T. at 78-79.

In its written opinion, the court attempts to justify its use of the critical tax return *de hors* the record on the fact that the accountant who prepared the return testified at the hearing. The accountant, however, provided no testimony regarding key aspects of the business return that factored heavily

into the court's decision,[2] nor did any other evidence admitted at the hearing relate to such information. For example, the business return's listing of deductions such as significant legal fees and truck and fuel expenses, which the court viewed with incredulity and, ultimately, rejected in its post-hearing opinion and order, were never addressed at the hearing; indeed, Father had no opportunity to explain these amounts to the court. The court likewise refers to various discrepancies between Father's personal and business tax returns with respect to gross sales and wages he drew from his S corporation, "two glaring errors [which] certainly called into question the accuracy of the information [Father] was providing to me." Lower Court Opinion, filed May 29, 2015, at 2-3. Again, the court acknowledges that it relied on evidence not of record to reject evidence of earning capacity that Father presented at trial.

Therefore, while the business return proved essential to a meaningful assessment of Father's income and earning capacity for child support purposes, and we agree with the lower court's demand for such information, we conclude it was nevertheless necessary for the court to receive the return as evidence in open court where the parties could examine it, testify to it, and thereby place it in context for the benefit of the court's analysis. To

---

[2] Indeed, the court indicates in its written opinion and order that neither accountant contributed anything significant to its analysis.

have rendered an ultimate decision on earning capacity on the basis of information obtained off the record was error.

Also without support in the record were the court's assumptions as to Father's ability to recoup all income lost from the discontinuation of large contracts by simply accepting a "myriad" of smaller jobs in their stead. Again, there was insufficient evidence adduced at trial to support this conclusion, which the court appeared to base on nothing other than its own experience and personal belief that there is always work available for good tradespeople. While both accountants testified to improving economic conditions in the local construction industry, such testimony fell well short of amounting to an earning capacity opinion that Father had the ability to offset all revenue losses from discontinued large contracts but had simply chosen not to act on such ability.

Our decisional law requiring child support orders based on on-the-record facts constrains us, therefore, to vacate the lower court's order and remand for further proceedings, where the court shall accept the 2013 business tax return in open court and invite testimony on it as well as on any other matter it deems pertinent to its task of ascertaining Father's earning capacity.

Order vacated. Case remanded for proceedings consistent with this decision. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/8/2016</u>

MEGHAN BARLOW,
    Plaintiff

:IN THE COURT OF COMMON PLEAS
:CHESTER COUNTY, PENNSYLVANIA

VS

:PACSES CASE NO. 090108307

KEVIN BARLOW,
    Defendant

:DOCKET NO. 01295N2013

Alice Buggy Miller, Esquire, Attorney for Plaintiff.
Barbara Schneider, Esquire, Attorney for Defendant.

## OPINION

This is an action by plaintiff to modify an existing support order entered on September 18, 2013 with an effective date of September 1, 2013. The original order covered two children, Madison (d.o.b. 9-23-09) and Konnor (d.o.b. 12/31/04). Another child, Khloe (d.o.b. 3/28/14), was conceived and born subsequent to the parties divorce. Plaintiff seeks to have Khloe added to the order as of April 16, 2014.[1] A further issue is the earning capacity of each party.

The parties have a 50-50 custody arrangement for Madison and Konnor. While wife has had primary custody of Khloe since birth, the parties agreed that she too would be included in the 50-50 custody arrangement effective March 15, 2015.

When the order of September 18, 2013 was entered, wife's monthly net income was "determined" to be $1,500 and husband's $2,000. I use the term "determined" loosely as neither party brought wage statements or tax returns to the conference to verify their

---

[1] Defendant questioned paternity which was scientifically established as of August 15, 2014.

incomes. They, not the court, "determined" what their incomes were. Now that the court has to "determine" earnings/earning capacity, it comes as no surprise that the parties disagree significantly as to what their earnings were or should be. The fact that both are self employed in occupations where cash is a common method of payment complicates my analysis.

Testimony was taken on December 16, 2014 at which time I had the opportunity to observe the witnesses, judge their demeanor and assess their credibility. Each witness will be addressed separately.

I also have the benefit of the parties briefs.

## Mrs. Barlow

In happier times, Mrs. Barlow worked in the day care industry where she earned approximately $30,000/year gross. Once her children were born she was able to bring them to work with her at no cost.

After the parties initially separated, she babysat out of her home for several children earning a comfortable sum. However, when she became pregnant with Khloe she had to cut back on the number of children she could supervise and, significantly, had to stop working for several months after Khloe was born. Obviously, this interruption caused a loss of clientele which is understandable. Further, the ability to supervise not only her own children, but other children was complicated by having to tend to an infant.

To the argument that she should attempt to return to a day care position, she responded that due to the ages of the children she would have to pay for their care which would greatly reduce her income.

Wife suggests that her current situation of babysitting at home is the most sensible approach, a position I agree with FOR THE TIME BEING.

Husband argues that wife's admitted monthly expenses of approximately $2,130 supports the conclusion that she must be earning $25,000 +/year babysitting. Wife countered that family was assisting her.

A further complication for wife's business model is that state law regulates the number of children that can be babysat at any one time. I realize this may be one of those regulations honored more in the breach than by compliance. However, it is a limitation on her earnings/earning capacity.

Wife's 2013 tax return showed receipt of gross income of $18,128 from her babysitting business. I do not have the benefit of a 2014 return, but imagine it would not be greater than her 2013 income given the birth of Khloe and the impact that had on wife's ability to babysit other people's children.

Accordingly, for 2014 I determine wife's earning capacity to be $18,128. For 2015, I determine her earning capacity to be $24,000 as I believe she will be able to rebuild her clientele to its former level.

## Mr. Barlow

Mr. Barlow is obviously very distressed by the dissolution of the marriage and asserts that it has impacted his ability to work. He also asserts that his business has suffered from the decision of former clients to take work he previously did for them "in house".

It has been my experience as a judge and practitioner, that "competent tradesmen" are always in demand no matter what the state of the economy is. While certainly larger clients may cut back in tight economic times, there are always a myriad of smaller jobs available for one wanting to work. In happier times, Mr. Barlow's business did very well. I am certain it did so as he was motivated to perform for the benefit of his family. It is therefore not surprising that the downturn in his business coincides with the dissolution of his marriage.[2] Interestingly, as of the date of the hearing, defendant did not have available for review his 2014 year to date profit and loss statement. In fact, he only submitted the 2013 tax return of his company after the hearing of December 16th was concluded. I am considering the document as it's preparer testified at the hearing. Initially, I note that there is a positive $12,000.00 difference between Exhibit D-3 and the 2013 tax return "gross receipts" number. Further, it is my understanding that Mr. Domenick, the CPA, was given the supporting data by Defendant and has just begun functioning as his accountant.[3] Despite my concerns, I accept the 2013 business tax return as accurate.

Defendant operates his business from his home which affords him a tax benefit yet his return shows a "rent" charge. He also purchased a new truck to replace one that was only

---

[2] Exhibit D-3 shows the decline in earnings that, in my view, coincides with the dissolution of the family unit: 2010 - $585,142.55; 2011 - $685,609.01; 2012 - $405,099.03; 2013 - $335,411.91

[3] A new accountant lacks a sense of the business "long term" as he has nothing to compare the data given to him with the historical record of the business. Accordingly, the numbers used for this return are viewed with some skepticism on my part.

13 months old. His stated reason for doing so is not credible. I am hard pressed to accept "automobile and truck expenses" of $10,838 for a single vehicle and that it cost $16,374 to fuel. I note that Mr. Barlow received a $26,093 "loan" from his company. There are significant legal fees ($6,015) and a "uniform" cost of $100/month. While all these deductions pass the federal tax SMELL test, they are warning bells to me that someone is intentionally trying to drive down their "income". I recognize that in "happier times" both parties are generally willing participants in this type conduct as the savings drop to the "joint" bottom line, i.e., real dollars available to spend. However, in times of conflict, this type of income adjusting quickly becomes unacceptable to one of the parties.

Mr. Barlow has an obligation to maximize his income for the benefit of his children even if doing so results in an indirect benefit to his former wife. The focus of all, court and parents, needs to be on the children, not indirect beneficiaries. When I add back "suspect deductions"[4] I find Mr. Barlow's 2013 income to be just over $100,000.00, a sum consistent with what a competent tradesman of his experience would earn. Accordingly, I find his earning capacity to be $104,000.00/year for 2013 and going forward.

### The Accountants

Ms. Evans testified for Plaintiff and Mr. Domenick testified for Defendant. Neither contributed anything of significance to my analaysis.

---

[4] To me, a "suspect deduction" is one that while allowed for federal tax purposes permits a person to shift what would otherwise be taxable outlays or income to tax deductible ones or to have the use of funds (a loan) versus ownership of the funds (income).

<u>Taxes</u>

It is in the parties mutual best interest to maximize the income available by allocating tax deductions between themselves in the most beneficial manner. Accordingly, my calculations were done with Defendant claiming all three children on his return.

Based on the foregoing I enter my

<u>ORDER</u>

AND NOW, this 13th day of February, 2015, the Order of September 18, 2013 is MODIFIED as follows:

1. Effective Aprl 16, 2014, Khloe Barlow is included for purposes of support and Defendant shall pay the following sums for the support of 3 children:

   a) For the period April 16 to December 31, 2014, the sum of $1,664.44/month[5] plus $90.00/month on arrears, and

2. Effective January 1, 2015 thru March 14, 2015, the sum of $1,631.15/month[6] plus $90.00/month on arrears, and

3. Effective March 15, 2015 forward the sum of $1,223.77/month[7] plus $90.00/month on arrears, and

---

[5] Plaintiff at $18,128, Defendant at $104,000 with Defendant claiming the 3 children and Plaintiff having Khloe full time with shared custody of the other children.
[6] Plaintiff at $24,000 Defendant at $104,000 with Defendant claiming the 3 children and Plaintiff having Khloe full time with shared custody of the other children.
[7] Plaintiff at $24,000, Defendant at $104,000 and shared custody of <u>all</u> children

4. Unreimbursed medical expenses are to be allocated 84% to Defendant and 16% to Plaintiff for the period up to January 1, 2015. Thereafter, said expenses are to be allocated 80% to Defendant and 20% to Plaintiff.

In all other respects, the order of September 18, 2013 is AFFIRMED.

BY THE COURT:

_____
Thomas G. Gavin                    S.J.

# APPENDIX B

MEGHAN BARLOW,  :  IN THE COURT OF COMMON PLEAS
Plaintiff

:  CHESTER COUNTY, PENNSYLVANIA

:

VS.  :  NO. 1295N-2013

:

KEVIN BARLOW,  :
Defendant  :

Alice Buggy Miller, Esquire, on behalf of the Plaintiff
Barbara Schneider, Esquire, on behalf of the Defendant

## OPINION

Defendant's concise statement of matters complained of raises

twenty-three (23) separate grounds for relief, one of which contains four

sub-paragraphs. Additionally, Defendant in his penultimate claim of error,

#24, seeks leave to (file),

> "Other errors that may become apparent upon review of the record
> once it is complete".

Clearly Defendant is dissatisfied with my opinion. However, his shotgun

approach is the very antithesis of what the statement envisions especially

when he repeats the same theme in different forms.

Where possible, I have grouped together what I consider to be

related issues for discussion:

### #1, #5, #6 and #15

I based Defendant's 2014 income on his 2013 tax return which

counsel asserts was not part of the record.

1

The hearing in this matter was held on December 16, 2014. Interestingly, Defendant did not have available his year to date 2014 profit and loss statements which I assume business people prepare on a monthly basis. He did present his 2013 personal tax return, see Exh. D-2. I note that in domestic relations cases it seems to be a common practice for one or both of the parties not to have available the very information that the court needs to render a decision. This is especially true in cases where one or both of the parties are self-employed. Defendant's 2013 personal tax return is meaningless without access to his business return which was the source of the income listed on the personal return. As his income was very much at issue, I anticipated that he would have the relevant information at hand. While his 2013 business return existed, it was not produced prompting me to direct defense counsel:

> ".......to provide me with a copy of that 2013 business return and provide the other side with it. Just for information purposes, I will look at it myself....." NT 12-16-14, pg. 78 L25-pg 79 L3.

Obviously, defense counsel knew I was going to consider it in reaching my decision, and I did. I attach it as an exhibit to this opinion.

Defendant submitted Exh. D-3 which listed his sales for the years 2010 thru 2013. I note that D-3 shows gross sales of $335,411.00 for 2013 whereas the 2013 corporate tax returns shows sales of $347,080.00.

2

Deducting the cost of goods sold, Defendant's company had net (before expenses) income of $191,713.00. Defendant's 2013 personal tax return showed wages of $38,289.00 whereas the 2013 corporate tax return showed "compensation of officers" as $49,337.00. These two glaring errors certainly called into question the accuracy of the information Defendant was providing to me. Defendant operates his business out of his home and I therefore disallowed the rent deduction of $6,657.00. I added back 50% of his vehicle and gas expense, to wit $13,606.00. I added back 50% of his internet, legal and professional fees - $3,757.00 and 100% of his uniform charge, $1,230.00. I disallowed depreciation of $14,431.00 claimed on his trucks.

Form 8824 of the 2013 corporate tax return shows that he traded in a truck acquired on September 11, 2012 for another truck on October 15, 2013. His stated reason for doing so was that,

> "The truck had a transmission problem that the dealership would not warrantee. So as I was driving down the road, the truck would continuously buck and lose speed. That's the worst thing for any construction company to call your customer and say your truck is broke down."

NT 12-16-14, pg. 76, L17-23

I did not credit that testimony as I find it hard to believe that the transmission in a 2012 truck would be out of warranty in a year. Further, I

3

find it difficult to accept that a person whose business was supposedly declining would incur an additional $30,000 expense to buy another truck from the same company that would not warrant the current one! Thus, I added back $14,431.00. His accountant indicated he contributed $17,500.00 to his retirement plans. While it is certainly prudent for him to be forward looking in setting money aside for his retirement, that must be subordinate to the current needs of his children. When I total these sums I get actual earnings greater than the $104,000.00 earning capacity I ascribed to him. Accordingly, no error was committed.

Defendant asserts error due to his inability to contest the reasonableness of the business deductions I added back. Again, had Defendant timely produced his 2013 business return this would not be an issue. When I directed that the return be provided, counsel could have requested that the record be kept open to address the return. Having failed to do so, the issue is waived.

#2, #3, #11, #12 and #19

All these issues revolve around my determination of Plaintiff's "earning capacity". Early in the parties' marriage, Plaintiff worked as the director of a child day care center where she earned $30,000.00/year[1].

---

[1] See NT 12-16-14, pg. 12, L24

Then, she had one child who was permitted to attend the day care center at no cost. *Id.* @ L 22.

Once the parties divorced (2012), she began a home-based babysitting business. During this time there appears to have been a reconciliation and she became pregnant with their child, Khloe, who was born on March 28, 2014. Unfortunately, the reconciliation failed and the parties now live separately. However, Plaintiff's ability to work is presently limited by the fact that she has an eight month old to care for as well as three other children, two of whom are under the age of ten.

Plaintiff's current ability to grow her babysitting business is further limited due to State regulations as to the number and ages of children she can babysit. In addition to her own infant, Khloe, she currently babysits another infant, Aden, who is younger than Khloe. She must also watch her own children when they are not in school. Her children are counted by the State regulations in the total number of children she can watch which is a further limitation on her earning capacity.

Plaintiff testified that if she returned to a day care setting she would have to pay for her children to attend day care and therefore such a

5

position did not make economic sense.[2] I agreed and determined that her plan of working out of her home made sense as:

1) She is caring for their infant, Khloe, and

2) She has all her children[3] 50% of the time, and

3) She watches all the children after school etc. during the 50% time period Defendant has them, and

4) She has been attempting to re-establish her babysitting business which suffered an understandable downturn due to the birth of Khloe in March of 2014, and

5) She earned $18,000.00 in 2013 when she did not have an infant of her own to care for, and

6) It is expected that she would be out of the workforce post-delivery of Khloe and suffer a decrease in earnings in 2014, and

7) It is expected that it will take time to maximize the number of children that she supervises, and,

8) The current arrangement is best suited to the circumstances presently confronting her.

Had Plaintiff not given birth to Khloe, I would have anticipated her 2014 income to be greater than her 2013 income as her business would

---

[2] See NT 12-16-15, pg. 12, L 8-14
[3] Beginning March 15, 2015

6

presumably have grown. It is certainly reasonable for a new mother to be out of the workforce for several months post-delivery and I therefore kept her 2014 income at the same level as 2013. For 2015, I believed $24,000.00 to be a reasonable income based on her past earnings and that Khloe would no longer be an infant allowing Plaintiff more flexibility as to the mix of children she can supervise. This is the very analysis called for by Pa.RCP, Rule 1910.16-2(d)(4). Plaintiff is essentially a high school graduate with on the job training in daycare whose greatest income was earned when she had one child. Now, she has four and significant childcare responsibility for HER OWN children. Frankly, I think she is doing the best she can and the income I ascribed to her reflects that fact.

### #4, 8, 14, & 18

Defendant asserts that I considered facts not of record in assessing his income. In my capacity as judge, I routinely come in contact with "trades people", most often in criminal cases. As they have fines and costs to pay, I inquire as to their income and job availability as it aids me in setting a payment schedule. I see "trades people" who are employees and those who own their own business. I see every skill level from unskilled to highly skilled. The greater the skill, the higher the pay. I have been asking these questions for 30 years, a period that includes boom and bust years

7

for the trades. Fortunately, Chester County is blessed with well-educated citizens who are usually the last to be impacted by a downturn in the economy, is home to major businesses and has fared much better economically than other parts of the state and country. All of this is a matter of public knowledge which I did consider in assessing defendant's comments as to his business and earnings. I did and do think it suspect that the decline in defendant's business coincided with the dissolution of his marriage. He would not be the first husband to cut back on his work efforts because of marital discord. Just because he said his business has suffered, does not mean I have to believe him. I did not as his testimony was inconsistent with what is commonly known.

As to his 2014 business records, I did draw a negative inference from his failure to produce them. A person whose business was supposedly on the decline would be expected to produce records documenting same.

### #13 & 17

Defendant asserts that I placed the sole burden of supporting the parties' children on him contrary to law.

I did no such thing. I gave the work-at-home mother of an infant and two children under age ten an earning capacity of $18,000.00 to

8

$24,000.00. She is certainly doing her part to meet the financial needs of the children consistent with her other obligations to them.

Defense counsel is free to characterize my comment that defendant should not be setting aside funds for his future needs when the children have current needs as, "maximizing his income for the benefit of his children". I did NOT suggest that only defendant do so. Plaintiff did not set aside dollars for her future needs as she had no such dollars available to her. Rather she was spending everything she earned for the children's current needs and benefit.

### #9

I am unable to address this issue as it grossly misstates plaintiff's prior income and also asserts, CONTRARY TO THE POSITION OTHERWISE TAKEN, that Defendant's income "had been increasing from prior years".

### #10

Defendant asserts that I should have considered financial assistance provided to plaintiff by family and/or third parties. Such funds are not "income" for support purposes. See 23 Pa. CSA §4302.

### # 7 & 16

As to business expenses, I am not required to follow federal tax deductibility standards. I have no doubt that defendant operated his business out of his home. However, he would have borne the expenses of that part of his home if he did not operate his business from it. Vehicle expenses are both business and personal and I did not allow the write off the federal tax authorities allow. The same is true for the "uniform" expense.

Defendant determines whether money taken from the business is a loan, salary etc. How the money is labeled affects its deductibility to the business and potential taxability to a third party. Loans are not income. However, loans put money in the recipient's pocket making it available to spend as he chooses. Here the fact that defendant was both recipient and lender prompted me to disregard his self-serving characterization of the transaction and to view it as income.

Defendant's corporate tax return for 2013 includes form 8824, "Like-Kind Exchanges". The "new" truck cost $42,285.00 and the "old" truck was valued at $11,624.00. This transaction sounds like a "purchase" to me.

10

#20

Footnotes 5, 6 & 7 show the facts upon which my support calculations were based. My opinion shows how I arrived at the various facts. I gave defendant the children for "exemption" purposes as it was the most tax advantageous way to handle the children. This information should enable Defendant to verify the calculations I ran as everyone uses the same tax software system.

#21

Obviously I disagree that my findings evidence bias. I believe they are supported by the record.

#22

Plaintiff produced her tax return which I considered together with all the evidence in setting her "earning capacity". I credited plaintiff's statements as to her earnings but determined she had a greater "earning capacity" and used it in my calculations.

I do not understand the complaint as to Plaintiff's expenses being accurate. She was asked to state them and did so. They were not challenged on cross. Regardless, they were a non-factor in my decision.

11

#23

I have already addressed Plaintiff's earning capacity.

To the suggestion that Plaintiff should be able to work[4] when defendant has the children, I accepted her explanation as to why that was not possible. She testified,

> Q. So what arrangements have you made to have children during the time that Mr. Barlow has the children 50 percent of the time?
>
> A. Mr. Barlow does not have them during the day when I work. They're with me. In the summer when they're off from school and during the week, Madison is with me. It always has been that. That has not changed thus far.
>
> NT 12-16-14, pg. 11, L23--pg. 12, L5

AND

> THE COURT: Now, in the period where your former husband has the two children during the day, assuming he is at work, who watches the children during the day?
>
> THE WITNESS: I do.
>
> THE COURT: So even though he has them 50 percent of the time, I'm not commenting negatively on it, physically, a portion of that, 50 percent of the time, the children are with you because he is working?

---

[4] I assume defense counsel means that she should be able to work more hours or at different employment when Defendant has the children. In light of her testimony, I find this suggestion unworkable, no pun intended.

12

THE WITNESS: Yes, but nighttime is how they delegate the custody; yes.

NT 12-16-14, pg. 19, L8-19

I respectfully submit that Defendant's appeal be denied.

BY THE COURT:

*Thomas G Gavin*

Thomas G. Gavin, S.J.

13